Andy WHITE et al., Appellants,

v.

C. B. McELROY, Appellee.

No. 5468.

Court of Civil Appeals of Texas.

El Paso.

July 26, 1961.

Rehearing Denied Oct. 18, 1961.

Turpin, Kerr, Smith & Dyer, Midland,. Travers Crumpton, Fort Stockton, for appellants.

John J. Watts, Odessa, Paul H. Dionne, Fort Stockton, for appellee.

FRASER, Justice.

This is a damage suit filed by appellee to recover for personal injuries received on June 8, 1958 when the car he was driving in Odessa, Texas, was hit from the rear by a pickup truck being operated by one Andy White, employee of appellant, Waukesha Sales & Service, Inc.

Trial was had to a jury, which rendered its verdict in separately stated amounts under Issue No. 1, totalling the sum of $145,-350. These various figures are based on physical pain, past and future; mental pain, past and future; decrease in earning ability of plaintiff, past and future; the jury finding a separate amount for each of the six items.

Before going into a discussion of the merits of the case, certain observations should, in our opinion, properly be made. For example, the defendant-appellant Service Company apparently does not try to deny the negligence of its employee, or that he was working for them in line of duty at the time of the accident. In fact, the employee, Andy White, testified that he had been working since the day before, was sleepy, and did not remember anything from the last stop-light he passed until the collision apparently awakened him. He does not remember seeing plaintiff's car ahead of him before the accident. Plaintiff testified that he was on his way, this Sunday, to a nursery for the purpose of buying shrubbery and plants. There is no charge that plaintiff was contributorily negligent in any way, and so we have a case where the negligence of the appellant is not in actual controversy; nor is it in doubt that appellee was injured. The record shows that he was taken to a hospital, where he was confined from June 8, 1958 to July 4th, and that he received much medication and was in traction except for stated intervals of rest, almost the entire time; further, that shortly thereafter, he was again returned to the hospital for treatment for a shorter length of time. It is also not contradicted that he suffered considerable pain over a long period of time. Therefore, the actual controversy seems to be the extent of his injury and the results therefrom. The injury was defined as a whiplash, with resultant injury to the tendons, ligaments and muscles of the neck and back. Some doctors indicated that these muscle or ligament injuries created a spastic condition which also affected the spine or vertebrae. It was also thought by two of the doctors that he might have had some brain injury. Four of the doctors testified that the appellee was totally and permanently disabled from doing manual labor or any work requiring physical exertion. Three doctors testified that appellee was able to work. There was considerable controversy, discussion and testimony as to appellee's state of mind and the condition of his nerves after this accident. This brings us to the first group of points.

Appellants' first six points generally complain of the court's refusal to permit the introduction of testimony, or the cross examination of witnesses with reference to the fact that appellee, a chiropractor, had for many years also practiced as a naturopath, and that in the few months preceding his accident, appellee had been enjoined from practicing as a naturopath and had been prosecuted by officials of Ector County, and had paid a fine for illegal practice of medicine. This matter was presented to the court in chambers, and his ruling was there made that such testimony could not be elicited or presented in any form to the jury.

Appellants maintain that this testimony was admissible to show one of the real reasons for the diminution of appellee's income and also to show that these incidents relative to the practice of naturopathy were the real reason that he was troubled in mind and spirit, and either lacked, or did not exercise, the will to go back to work. There was evidence from some of the doctors that this type of injury often produces emotional upsets, nervous troubles, etc.

We do not believe the trial court was in error in excluding the testimony with reference to the fact that appellee had been fined and prosecuted. We believe this matter would very likely have done more harm than good before the jury. It is entirely conjectural as to whether or not these particular matters robbed the appellee of his desire to work, or will to work, or caused him to be despondent, nervous and sleepless. We do not find, in the record, that he was ever asked, on cross-examination, if any reason other than his injury contributed to his lack of peace of mind. This question could likely have been asked and answered without going into details and without violating the court's admonition and ruling.

As to the exclusion of the testimony that he could no longer practice naturopathy along with his chiropractic activities, it is our candid opinion that the court could have, and probably should have, admitted this evidence, as we do not think it would have been prejudicial in any way. It was a matter informative in nature, and the jury could have well decided whether it had anything to do with his future earnings or not. However, we must say that we do not believe such error was harmful. Several of the doctors testified that he could not ever do any kind of physical work again. His wife testified that, in the seven or eight months preceding the accident, when he was practicing only as a chiropractor, his income was $450 to $500 per month. This, of course, was after he had been enjoined from practicing naturopathy. This testimony does come from an interested witness and, while it is not corroborated, neither is it attacked. The record does not indicate that any attempt was made to cross-examine appellee's wife on this matter. Further, it was stipulated that appellee had a life expectancy of between 17 and 18 years (he was 54 years of age at the time of the accident). The amount allowed by the jury for decrease in his ability to earn money was $64,800. This would amount to about $3,600 a year income, based on the number of years in his life expectancy, which is well below the figure his wife testified he was capable of earning. Therefore, the jury did not award him the full amount that he might have earned had he lived out this expectancy and worked at the wage rate testified to; but, in effect, awarded him about two-thirds of such amount.

It will be seen, therefore, that the jury had in front of it testimony of four doctors that he was totally and permanently disabled; the testimony of his wife that, practicing chiropracty alone, he had made $450 to $500 a month (approximately $6,000 a year) for the six or more months immediately preceding the accident. This, we believe, was sufficient evidence to enable the jury to form an opinion as to his future loss of earnings or earning ability. If he was making (and it is in the record without contradiction that he was) between $450 and $500 a month practicing only as a chiropractor, there seems to be no harm done by the fact that he was no longer practicing naturopathy. We do not find anything in the record, other than his cryptic statement—"The idea was to get out from under that" (apparently given as a reason for changing the location of his office after his trouble with the law)—to suggest or indicate that these troubles with the law, six or more months prior to his accident, were the reason for his mental troubles since the accident and existing in 1960. There is no evidence that he had any mental difficulties after these troubles and while he was confined solely to the practice of chiropracty. Appellants maintain, among other things, that it was this prior litigation that was bothering him, and rely somewhat heavily on the testimony of Dr. Cone. Dr. Cone's actual statement, in effect, was, "It would seem to give or rec. 2 weeks in mountains without thinking of himself * * * recent litigation * * * or trauma, might vastly improve him if the physical condition warrants it." This would seem to show that Dr. Cone apparently felt that there were several things that might contribute to appellee's mental problems, such as recent trauma or thinking of himself, as well as "recent litigation". These first two conditions do not seem to have any connection with his having been enjoined from practicing naturopathy. Appellants' own witness, Dr. Sibley, in his testimony, indicated that he thought the present litigation was what was bothering him; other doctors testified that he was mentally upset likely because of financial worries, hospital bills, and possible loss of his home. On the basis of the record, therefore, we do not feel that the exclusion of the proffered testimony was reversible error, as there seems to us to be sufficient evidence to warrant the jury's findings, and we do not feel that, had the testimony been included, it

would likely have caused a different verdict to be rendered, or figure reached, by the jury. The record does not seem to show that any attempt was made to question Dr. Cone as to *what* litigation he had in mind. It is not believed that either the appellants' brief or the bills of exception maintain or show that Dr. Cone, or any other doctor, would have testified that it was the excluded litigation to which they referred as that which possibly affected the recovery of plaintiff. Appellants' first six points are therefore overruled.

Appellants' Points 7 to 16 complain of the court's action in admitting certain statements and opinions taken from and produced by hospital records, and permitting certain doctors to testify therefrom.

At the outset, we are again reminded that there is no real controversy in this case to the effect that plaintiff did suffer serious injury at the hands of Waukesha's employee. Therefore, we are not primarily concerned in this case with the matter of negligence, or the actual fact of injury; but, rather, with the extent of the injuries, the treatment thereof, and the results therefrom. At the cost of being lengthy, we think it wise, for the proper evaluation of the case to include a brief summary of the medical testimony and reports, as we feel this case is impossible of disposition without thorough, careful and even repeated study of the record.

### Dr. Leigh (plaintiff's witness)

Testified about and from hospital records and charts of Medical Center Hospital, of Odessa, including X-rays—saw no fractures or abnormality—described whiplash injury, effect of same on ligaments and muscles, as well as describing the impact on the brain as the head is snapped back, causing the brain to be bounced against the bony skull—described treatment for whiplash—testified that many neck injuries caused nervous tension, emotional upsets, mood changes, etc.—stated that plaintiff had severe sprain or strain of ligaments but no tearing—had some disc displacement with probable resulting nerve pressure—plaintiff unable to do manual labor at this time—will have permanent pain condition.

### Dr. Leigh (cross-examination)

Was examined about X-rays and diagrams—testified that records show plaintiff suffering from prior arthritic condition—that he, as treating doctor, had patient in neck and leg traction—that plaintiff had no fractures—testified that he did not consider litigation as the cause of plaintiff's anxiety, but that same was likely caused from worry about finances, not being able to work, being in the hospital, and possible loss of his home.

### Dr. Ramsey (plaintiff's witness)

Answered hypothetical question that plaintiff's condition was due to the accident—that plaintiff would never be able to do manual labor or practice as a chiropractor—that his back can't be cured—will always have constant pain and would suffer mental anguish.

### Dr. Ramsey (cross-examination)

Examined plaintiff only once, on date of December 29, 1959.

### Dr. Spears (plaintiff's witness)

First examined plaintiff January 14, 1959 —found muscle rigidity and spasm in back —plaintiff unable to raise hands above head —limitation of motion of neck, arm and lower extemities due to pain—took many X-rays—found plaintiff had arthritic condition—found decrease in space between certain vertebrae, due to muscle spasm— that such would cause pressure on nerve root and cause pain—examined plaintiff again February, 1960—found little change in condition—testified that injuries resulted from his accident—that plaintiff was totally disabled from manual labor or labor requiring physical effort—that he will always

have pain, but a neuro-surgeon might operate and relieve some of pain.

### Dr. Spears (cross-examination)

Stated that most whiplash cases recover, but some take considerable time—there are exceptions—found no bone damage—testified plaintiff stated pain had decreased some —found little wrong with lower extremities.

### Dr. Cone (defendant's witness)

Found considerable prior arthritic changes—no damage to skeletal system from accident—plaintiff suffered a whiplash injury, traction applied, neck and foot, because of pain in lumbro-sacral area—plaintiff kept under moderate sedation—on second trip to hospital, plaintiff given daily ultrasonic physiotherapy, along with neck traction and sedation—testified and related Dr. Rader's diagnosis, with explanation and recommendations—this witness testified that he thought plaintiff needed the help of Doctors Grice and Rader—during September and October, 1958, plaintiff was given biweekly injections of cyanocobalamine—he expected plaintiff to recover and was disappointed that he did not—could not see any reason for his failure to get well, and found no reason why plaintiff could not return to work.

### Dr. Cone (cross-examination)

Read from hospital chart that plaintiff, on re-admission to hospital, was nervous, had emotional and mental upsets with jerking-like motion of hands and feet, and amnesia—that EEG was requested of Dr. Grice—that Dr. Rader would be asked to do a complete neurological DIFF—that plaintiff had slight cerebral hemorrhage and minor psychosis, meaning a brain lesion —that this witness diagnosed plaintiff's injury as a whiplash, and treated him accordingly—agreed that all radiologists and doctors in case had found straightening of plaintiff's spine due to muscle spasm, and pain in lumbar region—agreed with authors and lecturers cited by attorney for plain-

tiff that whiplash injuries usually produce disturbing emotional reactions or persistent psychoneurotic reaction—admitted that he suspected some brain-stem involvement— stated that he found nothing on last examination of plaintiff to account for his alleged inability to work as he had done before injury.

### Dr. Rainer (defendant's witness)

Examined plaintiff October 9, 1958 and May 7, 1959—detailed results of examination of plaintiff and history of injury and statements of pain—stated that plaintiff said he had to wear braces on neck continually except when in bed—that plaintiff said he had to take pills for pain because he had continued hurting of head, neck and back—that such pills did relieve the hurting—that he had to take sleeping pills— that he had lost 20 pounds since the injury —witness found stiffness and spasm of cervical muscles—abnormal swelling of glands in neck area—on second examination, 5/7/59, had same complaints of pain from plaintiff—found some spasm in neck muscles and muscular soreness in upper back and lumbar region—found no actual injury to the cervical spine or bony structure— found prior osteo-arthritic changes—that he thought no permanent disability could be attributed to the June 8, 1958 accident— that in May, 1959, plaintiff could have returned to doing some of the work he had been doing.

### Dr. Rainer (cross-examination)

Thought plaintiff had an uncommon amount of arthritis for a man his age.

### Dr. Sibley (defendant's witness)

Examined plaintiff January 28, 1960— found plaintiff had suffered moderately severe whiplash, which he describes as " * * * it was a result of being struck from the rear and his head, being on the end of his moderately long neck, whipped back like that and he over-compensated with his muscles and threw his head forward and then it came up again, perhaps

like so."—witness stated as follows: "I found that at the time of the accident he suffered cerebral concussion, which very frequently goes with whiplash injury."— stated that same was of a mild degree and was manifested by vomiting, dizziness and very brief loss of consciousness—that there was an aggravation of the degenerative joint between the fifth lumbar vertebra and the first sacrum—stated that he thought plaintiff had developed an anxiety state, which was a usual thing following such an accident, and had concern about ability to earn a living, concern about his comfort, concern about his future in general, and that there was a certain amount of mild hysteria—that he did not consider this evidence of malingering at all, stating: "I think it is a bona fide situation"—found no evidence of permanent harm from the cerebral vascular accident—that X-ray showing changes in spine indicated that such were old, with the exception of some straightening of vertebrae due to whiplash—that damage in the fifth lumbar area might not have resulted if joint had not already been diseased—found that plaintiff was able to go to work, but will suffer discomfort for weeks, months, or perhaps years, but that such should decrease rapidly following completion of this suit—testified that a suit such as this causes a person with a whiplash injury to be greatly concerned about what happened to him, his future, whether person responsible will be punished, results of suit—all of which create or cause anxiety which aggravates the symptoms—recovery largely depends on patient's will to get well, which is a highly· complex thing depending on patient's personality and background—in this situation, another person might have done better—or not as well —found that plaintiff had ten to fifteen per cent permanent bodily injury, superimposed on old condition.

### Dr. Sibley (cross-examination)

Plaintiff had moderately long neck—that whiplash injuries often cause variety of mental upsets and disorders—that even years later, things can occur as the result of the accident in this type of injury.

### Dr. Barry (plaintiff's witness)

Found plaintiff had damaged inter-vertebral disc between fifth lumbar and first sacral, with nerve root pressure—injury to neck and loss of curvature and some evidence of brain injury—did not think plaintiff could ever return to his profession as chiropractor, and will suffer permanent pain.

### Dr. Barry (cross-examination)

Saw patient only once, September 5, 1958.

We believe that appellants' points relative to these hospital records and their admission and testimony therefrom, must be overruled on the basis of the language of Articles 3737e and 5506a, Vernon's Ann. Revised Civil Statutes. Each succeeding case seems to amplify and further illumine Article 3737e. Travis Life Ins. Co. v. Rodriguez, Tex.Civ.App., 326 S.W.2d 256, affirmed 160 Tex. 182, 328 S.W.2d 434; 13 Tex.Jur., secs. 283, 284 et seq., beginning p. 475; State Automobile & Casualty Underwriters. v. Reagan, Tex.Civ.App., 337 S.W. 2d 522. In the above case, which seems to have no writ history, the records of the hospital contained data showing complaints of severe pain, and diagnosis of muscle spasm in the back, etc. This case also cites 38 Texas Law Review 645, 648. Appellants complain especially of the statements of Doctors McAllister and Lewis. These statements merely reflected their typed interpretations of X-ray pictures from the hospital records. Appellants also complain of the reports of Doctors Rader and Grice, but it will be noted that appellants' own witness, Dr. Cone, related Dr. Rader's diagnosis himself, and further testified that appellee should have the help of Dr. Grice and Dr. Rader. Complaint is also made that Dr. Grice's report probably originated the claims of brain damage; but it will be remembered that Dr. Leigh described the result of whiplash injury to the brain; that

Dr. Barry, who examined plaintiff in September of 1958, found some evidence of brain injury; that Dr. Cone testified as to slight cerebral hemorrhage and minor psychosis; further, that he suspected brainstem involvement. Dr. Sibley testified flatly that he thought plaintiff had suffered a cerebral concussion and had sustained a cerebral vascular accident, but that no permanent harm had resulted therefrom. We do not feel it to be reasonably inferable that Dr. Grice's opinion or diagnosis could have resulted in the diagnoses, above described, of these other doctors. On the basis of the above cited authorities and the authorities cited therein, and the medical record, as well as the fact that there was cross-examination of much of the complained of material, plus the fact that these were records and reports of a duly constituted and reputable hospital, we feel there is not sufficient merit in appellants' points, and they are accordingly overruled.

■ Appellants' Point 17 complains of the fact that this matter was submitted to the jury on one issue of damages, broken down into six elements as described early in this opinion. Considering this issue and the court's explanation of same, we do not believe it was error to submit the matter in this fashion. This method is suggested in Lieck's Legal Trial Aid, second edition, page 771, and has found approval in several cases, such as the following: Texas & N. O. R. Co. v. Wilkerson, Tex.Civ.App., 260 S.W.2d 912 (n. r. e.); Crowell-Gifford Furniture Co. v. Cloutman, Tex.Civ.App., 276 S.W.2d 539 (n. r. e.). We believe the appellee's pleadings and proof are sufficient to authorize the submission of the issue in this manner, and appellants' Point 17 is therefore overruled.

■ Appellants' Point 18 complains of the court's action in permitting appellee to file his trial amendment enlarging his claim for damages. We do not feel that the record shows that the trial court abused its discretion in permitting such amendment.

■ Appellants' Points 19 to 23 assert that the verdict is so large that prejudice is shown as a matter of law. While we overrule these points, we do feel that a remittitur is called for. Remittitur causes the appellate court to become actually a fact-finding body, as it must determine for itself whether damages allowed by the trial court are excessive. In this case, we do not have the problem of determining whether any of the alleged errors complained of caused the jury to find defendants guilty of negligence, or caused the jury to find, sympathetically, that plaintiff was hurt. These things are not in active, actual controversy in this case. We are, rather, relegated to the problem of whether the jury went too far in allowing the amounts that it did for damage and pain and loss of earnings. We feel that certain elements are not fully justified as to their amounts by the evidence. For example, we believe that the amounts found for future pain and suffering, mental and physical, are not justified by the evidence, which is not very strong on future mental pain and anguish, and does indicate that much of the future physical pain can be relieved by medication or possible surgery. We think, therefore, that the judgment or verdict is excessive to the amount of $30,000.

Appellants' 24th point is overruled, as we do not find any reason to submit the issue of unavoidable accident, nor do we find merit in the point in any respect.

We suggest that the appellee file a remittitur in the sum of $30,000 on or before the 9th day of August, 1961. If this is done, the judgment of the trial court will be affirmed; otherwise, it will be remanded for a new trial.

If such remittitur is filed, appellants' points will all be overruled, and the case affirmed.

CLAYTON, J., not sitting.